**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISON**

**Leonard Lans,**

**Plaintiff,**

**v.** **Case No.**

**Cellco Partnership d/b/a Verizon Wireless,**

**Defendant.**

______________________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, **Leonard Lans** ("Plaintiff" or "Lans"), by and through the undersigned counsel, hereby files this complaint against Defendant, **Cellco Partnership d/b/a Verizon Wireless** ("Defendant" or "Verizon"), and alleges as follows:

## JURISDICTION AND VENUE

1. This action seeks damages and equitable relief for intentional race discrimination and, subject to the specific allegations below, retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 et seq. ("FCRA").

2. This Court has original subject-matter jurisdiction over the Title VII claims under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

3. This Court has supplemental jurisdiction over the FCRA claims under 28 U.S.C. § 1367(a) because they arise from the same employment relationship,

performance-management process, and termination as the Title VII claims and form part of the same case or controversy.

4. Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3). The challenged employment practices occurred in Hillsborough County, Florida, and Lans worked, and would have continued working but for his termination, at Verizon's Temple Terrace location in this District. This action is properly brought in the Tampa Division.

## PARTIES

5. Plaintiff is a Black individual who, at all relevant times, resided in Hillsborough County, Florida.

6. Verizon is a partnership doing business in Florida, including at 7701 East Telecom Parkway, Temple Terrace, Florida 33637. Verizon employed Lans and controlled the terms and conditions of his employment.

7. At all relevant times, Verizon was engaged in an industry affecting commerce and employed at least fifteen employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Verizon was an employer subject to Title VII and the FCRA.

8. Jennifer Byrd was Lans' direct supervisor in Florida. Luis Cruz was Byrd's manager and Lans' Senior Director. Rachel Kochera was a Human Resources

Business Partner involved in Lans' performance-management process. Sam Isserman also supervised or evaluated Lans during 2024.

9. Verizon acted through its supervisors, managers, and Human Resources personnel in evaluating Lans, administering his performance-improvement process, making sales-credit decisions, and terminating his employment. The challenged actions were taken in the course of their employment and on Verizon's behalf.

**ADMINISTRATIVE EXHAUSTION AND CONDITIONS PRECEDENT**

10. In May 2025, Lans filed a verified administrative charge against Verizon alleging race discrimination and retaliation, including his January 2025 termination. The EEOC assigned Charge No. 511-2025-03241. The charge requested filing with both the EEOC and the Florida Commission on Human Relations ("FCHR").

11. Lans filed the charge within 300 days of his termination for purposes of Title VII and within 365 days of his termination for purposes of the FCRA. The claims asserted here fall within the allegations of the charge or the investigation reasonably arising from those allegations.

12. On July 26, 2026, the EEOC issued a Notice of Right to Sue at Lans' request, stating that more than 180 days had passed since the charge was filed and terminating its processing of the charge.

13. This action is commenced within ninety days of the first legally operative receipt of that notice.

14. More than 180 days elapsed after the administrative charge was filed without the FCHR conciliating the charge or determining whether reasonable cause existed. Lans proceeds with his FCRA claims under Fla. Stat. § 760.11(8).

15. All conditions precedent to the claims properly included in this action have occurred, have been satisfied, or have been waived.

## FACTUAL ALLEGATIONS

16. Plaintiff began working for Defendant in approximately November 2010. In 2022, after years of employment with Verizon in New York, he moved to Florida and assumed a sales-leadership role reporting to Byrd, who is White.

17. At the time of his termination, Lans held the position of Associate Director–Business Sales. He led a team of sales representatives serving several Florida counties and was responsible for sales results, customer relationships, employee development, and sales activity.

18. Lans possessed the experience and skills required for that position. Verizon selected him for the Florida leadership role in 2022, and he continued performing its responsibilities through January 2025.

19. Verizon's managers knew Lans was Black.

20. When Lans assumed responsibility for the Florida team, he was directed to improve accountability, activity, and results within an organization that already had team-culture and performance challenges.

21. Lans implemented structure, prospecting expectations, customer meetings, and accountability measures. Despite implementing those directives, he was criticized for creating a poor team culture without appropriate consideration of the problems that predated his arrival.

22. Cruz repeatedly singled Lans out on leadership calls with targeted questions and public criticism that non-Black leaders were not subjected to in the same manner. Byrd also praised submissions by non-Black leaders while dismissing substantially identical submissions from Lans.

23. Lans was held to more demanding and inconsistently applied expectations than non-Black Associate Directors, including in the treatment of satisfactory performance months, sales credit, and opportunities to complete the performance-improvement process.

24. Verizon placed Lans on formal documented counseling in January 2024, issued a written warning in May 2024, and escalated him to a final written warning in June 2024.

25. Verizon's written performance documents required three consecutive months of satisfactory performance. The final written warning referred to meeting scorecard and activity expectations.

26. Lans identified specific inaccuracies and omissions in the information used to criticize his leadership. For example, Verizon criticized his absence from an April 10, 2024 prospecting event even though Byrd had approved his attendance at a customer meeting, and he returned to perform interviews and other leadership duties.

27. Lans also explained that criticism of his handling of an Advanced Diagnostic customer account omitted his efforts to resolve the customer's suspension problem and maintain the customer relationship before the customer later sought disconnection.

28. In June 2024, Lans requested corrections to the final written warning, including the composite score, the number of qualifying customer appointments, and the stated opportunity target. He identified supporting activity information and requested recognition of improvements in his team's activity.

29. Verizon's 2024 mid-year review recognized favorable performance as well as areas for improvement. It recorded first-half sales revenue attainment of 104.4% and described a large VZConnect transaction as a significant success. Isserman also described Lans as a strong salesperson in front of customers.

30. Lans' performance improved during the second half of 2024. His territory-performance summary ranked him third among fifteen FAM-market leaders for that half of the year and sixth among fifteen year to date. A separate January 2025 summary listed him sixth among nineteen FAM leaders. These rankings reflected different reporting populations and were not a representation that he met every individual metric in every month.

31. In June 2023, Lans' team received sales credit for Galaxy Fireworks activations, including eleven activations processed through the customer's MyBiz account and transferred from Cruz's house account with Cruz's approval.

32. Plaintiff's team continued managing and supporting Galaxy Fireworks. In June 2024, the team's representative, Mike Fegadel, handled another seasonal project for that customer. The transaction involved eighty-nine tablet activations; five were credited to Fegadel, while eighty-four processed through MyBiz remained in Cruz's house account.

33. On or about June 28, 2024, Isserman informed Lans that Cruz would not approve transferring credit for those eighty-four activations.

34. On July 8, 2024, Lans explained to Kochera and Isserman that allocating the disputed activations to his team would raise his June composite score from approximately 62% to 70.15% and increase quota participation from 25% to

50%. He also identified improvements in prospecting calls, customer appointments, and opportunity creation and requested that June be treated as a hold month.

35. In December 2024, Byrd approved crediting another Galaxy Fireworks transaction outside Cruz's house account for the benefit of a non-Black colleague. Byrd distinguished the December processing from the June MyBiz processing, although MyBiz activations for the same customer had previously been credited to Lans' team in June 2023 with Cruz's approval.

36. Defendant's inconsistent handling of these transactions deprived Plaintiff of credit material to his performance evaluation while he remained on a final written warning.

37. Verizon's written July 2024 PIP status stated that Plaintiff reached the 70% scorecard number and expressly recognized July as "month 1 of 3."

38. Verizon's written August 2024 PIP status recorded an 84% composite score and expressly recognized August as "month 2 out of 3."

39. For September 2024, Verizon continued the final written warning on a hold, citing concerns about deal engagement and low team activity.

40. For October 2024, Verizon recorded a "Make month" but restarted the count at "1 of 3," rather than carrying forward the two satisfactory months it had already recognized.

41. A subsequent PIP-status record recognized a "Make month 2 of 3" while continuing the PIP and noting concerns about new-logo appointments, funnel growth, and new-hire development.

42. Lans had understood a hold month to be excluded from the count rather than to erase previously credited satisfactory months. Verizon required him to restart the count, extending his exposure to termination despite its prior written recognition of his July and August performance.

43. Non-Black Associate Directors with comparable or worse performance metrics remained employed, and similarly situated White employees on PIPs were not subjected to the same restart requirement. Plaintiff was denied the same opportunity to complete the process through consistent recognition of satisfactory months.

44. On January 10, 2025, Plaintiff requested that December be treated as a make month because ten customer-approved smartphone lines scheduled for year-end processing had failed activation. He explained that counting the transaction in December would bring his composite score to approximately 70%.

45. Kochera questioned whether the transaction would satisfy the separate quota-participation requirement and also acknowledged that the dashboard had displayed approximately 68% before changing to approximately 48%. Lans did not claim that this transaction alone necessarily satisfied every PIP requirement.

46. In January 2024, Lans raised concerns with Kochera about his treatment by Byrd. His January 22 follow-up requested empowerment, support, and communication. He subsequently discussed his concerns with Cruz and Kochera.

47. Plaintiff made protected complaints that he felt he was being treated less favorably than his similarly situated colleagues.

48. Cruz promised joint meetings involving himself, Lans, and Byrd, followed by weekly checkpoints to resolve the supervisory concerns. Those promised joint meetings and checkpoints did not occur.

49. Defendant terminated Plaintiff's employment on or about January 28, 2025.

50. Verizon stated that it terminated Lans for unsatisfactory performance, including sales and leadership concerns. Those stated reasons were a pretext for intentional race discrimination, as shown by the differential treatment of non-Black colleagues, the inconsistencies in sales-credit decisions, the restart of acknowledged satisfactory months, and the selective treatment of his performance and leadership record.

51. Verizon's use of the challenged performance process culminated in the loss of Lans' position, compensation, and employment benefits. Earlier events outside an applicable administrative filing period are pleaded as background

evidence of motive and pretext, not as independently recoverable, untimely discrete acts.

52. As a direct and proximate result, Lans has suffered lost wages, incentive compensation, employment benefits, and other remuneration, together with emotional distress, humiliation, and loss of dignity. His economic losses include the value of employment-related benefits and equity compensation to the extent lost because of the termination and established by the governing benefit and award terms.

53. Verizon maintained policies prohibiting discrimination and retaliation. Its managerial personnel nevertheless intentionally imposed the discriminatory treatment described above and used that process to terminate Lans, with malice or reckless indifference to his protected rights.

54. Defendant did not offer Plaintiff severance pay, although severance pay had been standard for similarly situated colleagues in the past.

55. Defendant chose to take adverse employment action against Plaintiff by retaliating against him for engaging in protected activity under Title VII and the FCRA.

56. Defendant's actions were willful and done with a reckless disregard for Plaintiff's rights under Title VII and the FCRA.

57. Lans has retained undersigned counsel to pursue this action.

## COUNT I —RACE DISCRIMINATION UNDER TITLE VII 42 U.S.C. § 2000e-2(a)(1)

58. Plaintiff realleges and readopts the allegations set forth in Paragraphs 1 through 57 of this Complaint as though fully set forth herein.

59. Plaintiff is Black and is therefore a member of a protected class under Title VII. Plaintiff was qualified for his Associate Director-Business Sales position through his experience, selection for the Florida leadership role, and demonstrated ability to perform the work.

60. Defendant intentionally treated Plaintiff less favorably because of his race in administering the performance-management process that culminated in his termination, including its treatment of sales credit and satisfactory performance months.

61. Defendant terminated Plaintiff's employment because of his race. Race was a motivating factor in the challenged employment decision.

62. The more favorable treatment of non-Black Associate Directors and White employees on PIPs, together with the specific inconsistencies described above, supports the inference that Defendant's asserted performance justification concealed intentional discrimination.

63. The discriminatory termination was an adverse employment action that deprived Plaintiff of his position, compensation, and benefits. Defendant is

responsible for that employment decision and for the discriminatory managerial actions used to bring it about.

64. Defendant's violation directly and proximately caused the damages described in paragraph 54. The intentional managerial conduct described in paragraph 52 supports an award of punitive damages to the extent authorized by law.

**WHEREFORE**, Plaintiff requests judgement against Defendant on Count I, awarding:

(a) Back pay, lost incentive compensation, lost benefits, and other remuneration, with prejudgment interest as allowed by law;

(b) Reinstatement to his former position or a substantially equivalent position, with restoration of appropriate seniority and benefits, or front pay in lieu of reinstatement if reinstatement is not feasible;

(c) Compensatory damages for emotional distress and other proven injuries under 42 U.S.C. § 1981a, subject to applicable limitations;

(d) Punitive damages under 42 U.S.C. § 1981a, subject to applicable limitations;

(e) Reasonable attorney's fees and recoverable costs under 42 U.S.C. § 2000e-5(k);

(f) Appropriate equitable relief addressing the discriminatory employment decision and its continuing effects, including correction of employment records to the extent warranted;

(g) Post judgment interest as allowed by law; and

(h) Such other relief as the Court deems just and proper, without duplicative recovery.

**COUNT II — RETALIATION UNDER TITLE VII**
**42 U.S.C. § 2000e-3(a)**

65. Plaintiff realleges and readopts the allegations of paragraphs 1 through 57 of this Complaint, as though fully set forth herein.

66. Plaintiff is a member of a protected class under Title VII.

67. Plaintiff exercised or attempted to exercise his rights under Title VII by complaining about race discrimination and disparate treatment, thereby engaging in protected activity under Title VII.

68. Before the termination decision, Defendant's responsible decisionmaker(s) knew of that protected activity.

69. Defendant thereafter terminated Plaintiff's employment. Termination was materially adverse and would dissuade a reasonable employee from opposing discrimination.

70. There is a causal connection between Plaintiff's opposition to race discrimination and his termination.

71. Defendant retaliated against Plaintiff for engaging in protected activity under Title VII by terminating his employment.

72. Defendant has taken material adverse action against Plaintiff.

73. Defendant's actions were willful and done with malice.

74. Plaintiff was injured due to Defendant's violations of Title VII, for which Plaintiff is entitled to legal and injunctive relief.

**WHEREFORE**, Plaintiff requests judgement against Defendant on Count II, awarding:

(a) Back pay, lost incentive compensation, lost benefits, and other remuneration, with prejudgment interest as allowed by law;

(b) Reinstatement with restoration of appropriate seniority and benefits, or front pay in lieu of reinstatement if reinstatement is not feasible;

(c) Compensatory damages under 42 U.S.C. § 1981a, subject to applicable limitations;

(d) Punitive damages under 42 U.S.C. § 1981a, subject to applicable limitations;

(e) Reasonable attorney's fees and recoverable costs under 42 U.S.C. § 2000e-5(k);

(f) Appropriate equitable relief addressing the retaliatory employment decision and its continuing effects;

(g) Post judgment interest as allowed by law; and

(h) Such other relief as the Court deems just and proper, without duplicative recovery.

**COUNT III – RACE DISCRIMINATION UNDER THE FCRA**
**Fla. Stat. § 760.10(1)(a)**

75. Plaintiff re-alleges and readopts the allegations of paragraphs 1 through 57 of this Complaint as though fully set forth herein.

76. Plaintiff is Black and was qualified to perform the Associate Director-Business Sales position through his experience, selection for the Florida leadership role, and demonstrated ability to perform its responsibilities.

77. Defendant intentionally discriminated against Plaintiff because of his race in administering the performance-management process that culminated in his termination, including its treatment of sales credit and satisfactory performance months.

78. Defendant treated non-Black Associate Directors with comparable or worse performance metrics more favorably and did not impose the same restart requirement on similarly situated White employees on PIPs.

79. Defendant terminated Plaintiff because of his race, in violation of Fla. Stat. § 760.10(1)(a). Its asserted performance justification was a pretext for the discriminatory decision, as supported by the particular comparative treatment and inconsistencies described above.

80. The termination deprived Lans of his employment, compensation, and benefits and directly and proximately caused the damages described in paragraph 52.

81. Plaintiff was subjected to disparate treatment on account of his race.

82. Defendant's actions were willful, knowing and voluntary, and otherwise done with malice and/or reckless indifference for Plaintiff's rights.

**WHEREFORE**, Plaintiff requests judgement against Defendant on Count II, awarding:

(a) Back pay, lost incentive compensation, lost benefits, and other remuneration, with prejudgment interest as allowed by law;

(b) Reinstatement with restoration of appropriate seniority and benefits, or front pay in lieu of reinstatement if reinstatement is not feasible;

(c) Compensatory damages, including mental anguish, humiliation, loss of dignity, and other proven intangible injuries, under Fla. Stat. § 760.11(5);

(d) Punitive damages under Fla. Stat. § 760.11(5), subject to its applicable limitation;

(e) Reasonable attorney's fees and recoverable costs under Fla. Stat. § 760.11(5);

(f) Appropriate affirmative and equitable relief addressing the discriminatory decision and its continuing effects;

(g) Post judgment interest as allowed by law; and

(h) Such other relief as the Court deems just and proper, without duplicative recovery.

## COUNT IV – RETALIATION UNDER THE FCRA
## Fla. Stat. § 760.10(7)

83. Plaintiff re-alleges and readopts the allegations of paragraphs 1 through 57 of this Complaint as though fully set forth herein.

84. Plaintiff is a member of a protected class under the FCRA.

85. Plaintiff opposed race-based differential treatment that he reasonably believed in good faith violated the FCRA.

86. Defendant's decisionmaker(s) knew of that opposition before making the termination decision.

87. Defendant terminated Plaintiff because of that protected opposition. Termination was materially adverse and would dissuade a reasonable employee from opposing race discrimination.

88. Defendant retaliated against Plaintiff for engaging in protected activity under the FCRA by terminating Plaintiff's employment.

89. Defendant's actions were willful, knowing and voluntary, and otherwise done with malice and/or reckless indifference for Plaintiff's rights.

90. Plaintiff was injured due to Defendant' willful violations of the FCRA, to which Plaintiff is entitled to legal and injunctive relief.

**WHEREFORE**, Plaintiff requests judgement against Defendant on Count IV, awarding:

(a) Back pay, lost incentive compensation, lost benefits, and other remuneration, with prejudgment interest as allowed by law;

(b) Reinstatement with restoration of appropriate seniority and benefits, or front pay in lieu of reinstatement if reinstatement is not feasible;

(c) Compensatory damages, including mental anguish, humiliation, loss of dignity, and other proven intangible injuries, under Fla. Stat. § 760.11(5);

(d) Punitive damages under Fla. Stat. § 760.11(5), subject to its applicable limitation;

(e) Reasonable attorney's fees and recoverable costs under Fla. Stat. § 760.11(5);

(f) Appropriate affirmative and equitable relief addressing the retaliatory decision and its continuing effects;

(g) Post judgment interest as allowed by law; and

(h) Such other relief as the Court deems just and proper, without duplicative recovery.

**JURY TRIAL DEMAND**

Plaintiff demands trial by jury as to all issues.

Dated this 21st day of October 2026.

Respectfully submitted,

*/s/ Chad A. Justice*

**CHAD A. JUSTICE**
Florida Bar Number: 121559
**SAMUEL DOXSEE**
Florida Bar Number: 127318
**JUSTICE LITIGATION ASSOCIATES, PLLC**
1205 N Franklin St
Suite 326
Tampa, Florida 33602
Direct No. 813-566-0550
Facsimile: 813-566-0770
E-mail: chad@justicelitigation.law
E-mail: sam@justicelitigation.law
**Attorneys for Plaintiff**